PIERCE v. COMBINED HEAT & SPRINKLER CO.

(District Court, D. Massachusetts.   April 24, 1916.)

No. 538.

PATENTS ⬳328—VALIDITY AND INFRINGEMENT—COMBINED WATER HEATING AND SPRINKLER SYSTEM.

    The Hammond patent, No. 1,058,968, for a combined water heating and sprinkler system, *held* valid, and entitled to a sufficiently broad construction, in view of the prior art, to show infringement by the apparatus of defendant.

In Equity.   Suit by Andrew G. Pierce, Jr., against the Combined Heat & Sprinkler Company.   On final hearing.   Decree for complainant.

The following are the diagrams referred to in the opinion of the court:

W. B. Hammond Patent.   No. 1,058,968.

Nutter and Chatman Patent.   No. 1,087,136.

*Fig. 1.*

Plaintiff's Exhibit **2.**

Odin Roberts and Roberts, Roberts & Cushman, all of Boston, Mass., for plaintiff.

Fish, Richardson, Herrick & Neave and Harrison F. Lyman, all of Boston, Mass., for defendant.

DODGE, Circuit Judge. The plaintiff owns United States patent 1,058,968, issued April 15, 1913, to W. B. Hammond, for improvements in combined water heating and sprinkler systems. The defendant company has made and used apparatus shown, as is agreed, in a drawing identified as Plaintiff's Exhibit 2, which apparatus is claimed by the plaintiff to embody the improvements covered by claims 1 and 2 of the Hammond patent, and therefore to infringe those claims.

Whether or not infringement is proved is the only question in dispute. The defendant denies the validity of the patent in suit only in case it is to be construed broadly enough to cover the differences upon which it relies between its apparatus and that which the patent describes.

Hammond's specification begins with the statement that his invention relates to—

"combined water heating and sprinkler systems such as have recently been proposed and by means of which a single system of piping installed near the ceiling of apartments to be heated is availed of also to perform the duty of a fire-extinguishing system controlled in cases of emergency by the automatic operation of sprinkler heads."

He goes on to set forth that the sprinkler heads of such a fire-extinguishing system are required to release the water when their temperature has risen to about 160 degrees, while effective heating often requires water to be carried through the pipes of the system heated at its entrance as high as 212 or 220 degrees. Proximity of the sprinkler heads to the pipes containing water at such temperatures is apt to result in keeping the sprinkler heads at temperatures too near their releasing temperature. He then continues:

"I am aware that, previous to my invention herein described, it has been proposed to apply sprinkler heads to vertical offsets joined to a hot water circulating pipe, but I have observed by experiment and practice that in such constructions the temperature of the sprinkler heads always rises to and frequently beyond the releasing temperature whenever the water in the heater pipe is raised to a temperature effective for heating purposes."

It may conveniently be stated at this point that the "heating and sprinkler systems such as have recently been proposed," to which Hammond here referred, are covered by United States patent 1,078,-136, issued February 17, 1914, to Nutter and Chatman, for combined heating and sprinkler system. Although this patent was issued several months later than Hammond's, it had been applied for May 26, 1906, some years before Hammond's application for his patent in suit, which was filed December 7, 1911.

Although "means to insulate the sprinkler heads from the heat of the circulating water" were described and claimed in this Nutter and Chatman patent, the only sprinkler heads described were each to be

screwed into a nipple, which was in turn to be screwed into a bushing of heat-insulating material carried by a T in the circulating pipe. Each such nipple carrying a sprinkler head was shown as rising vertically from the circulating pipe toward the ceiling and separating the sprinkler head carried, by a short interval only, from the circulating pipe or the T therein. According to the patent, air in an air chamber formed in the nipple was relied on to prevent direct contact between the hot water in the pipe and the sprinkler head valve. These were to be insulated sprinkler heads, only "if desired," in which case "some suitable form" of them was to be used. But it appears from the evidence in this case that no such heat-insulated sprinkler heads as described by Nutter and Chatman have ever been commercially used, and when experimentally used they have failed to work as intended.

On the Nutter and Chatman application interferences were declared in the Patent Office involving all its broader claims, and to these both Hammond and Pierce, the present plaintiff, were parties. The result upon all was in Nutter and Chatman's favor.

Returning now to Hammond's patent in suit, he proceeds therein, after what has been last quoted from it, to describe his invention as follows:

"I have discovered that if the sprinkler offsets in a hot-water circulating pipe are so constructed that the sprinkler head at the dead end of such an offset is at a horizontal distance measured along the pipe connection, whether this be straight or curved, from the junction with the circulation pipe which is decidedly in excess of its vertical displacement therefrom, communication of heat by circulation in the offset itself is practically cut off, and the heat-insulating effect of trapped gases in the offsets rendered effective to maintain the temperature at the sprinkler head at a safe point, though that of the circulating water in the circulation pipe be carried to the practical highest limit."

There are four claims in all, two only being involved in the present suit. Each of these covers the combination of certain elements in a "combined circulatory water heating and sprinkler system." The specified elements in claim 1 are:

(1) A pipe for the circulation of heating water.

(2) Upwardly branching offset pipes secured to the circulation pipe and in communication therewith, said offsets terminating in dead ends, the horizontal component of offset of said dead ends from the junction with the circulating pipe measured along the offset being materially greater than the vertical component.

(3) Sprinkler heads secured to said offsets at their dead ends.

Claim 2 differs from claim 1 only in its description of the element I have numbered (2). Instead of "upwardly branching offset pipes," etc., claim 2 reads "upwardly and laterally branching offset pipes," etc.

Sprinkler heads carried on offsets such as are described and claimed by Hammond have proved operative for the purpose intended and commercially successful. Extensive installations have been made containing them, under license from the plaintiff.

Hammond's offset pipes are secured to T's, used as couplings for the circulation or heater pipes at the desired points, and each com-

prises an elbow connecting it with the T, and a straight dead end section, at the end whereof the sprinkler head is secured in vertical position by another elbow. They are smaller in diameter than the heater pipes. Two forms are shown. In that shown by Figs. 1 and 2 of the patent the offset projects from the upper portion of the heater pipe, and the position of its "dead end section," lying horizontally above the heater pipe, permits drainage from it back into the heater pipe; but its extension in that plane is at an angle with the latter, so that most of it lies outside the region directly over the heater pipe, and the sprinkler head it carries is brought wholly outside that region. This is called in the patent the preferable construction. In the other form (Fig. 3) the offset projects at first sidewise from the heater pipe and then has its "dead end section" canted upward, so as to be for the most part above the level of the heater pipe. In both forms the sprinkler head, instead of being directly over the heater pipe, is brought far enough away from it horizontally to be out of any direct current of heated air arising therefrom. In the second form the entire offset as well as the sprinkler head is outside the region directly over the heater pipe.

The offsets used in the defendant's apparatus shown in Exhibit 2 project from the side, not the top, of the heater pipe. They consist, not of straight "dead end sections," with elbow connections at either end, like those of the patent, but of curved sections of pipe smaller in diameter than the heater pipe, which, after a short lateral projection from it, are bent so as to form a depression or loop in a vertical plane parallel with it, at first downwardly from its level and then upwardly so as to terminate at a point slightly above the level of its top. Upon this termination the sprinkler head is carried, for which a position is thus secured at a level above the heater pipe and also removed horizontally from region directly over it.

It is true of the defendant's offsets, as of those described in the patent, that their dead ends to which the sprinkler heads are secured are further removed horizontally than they are vertically from the point where the offset leaves the heater pipe; and it seems to me that the provisions of the claims regarding horizontal and vertical "components of offset," fairly construed in connection with the specification, must be taken as covering them, unless for reasons to the contrary not apparent from the patent itself. The defendant says that they are neither "upwardly branching" (claim 1), nor "upwardly and laterally branching" (claim 2). They are certainly "laterally branching," and the main reason suggested for not calling them "upwardly branching" is that they branch downwardly before they branch upwardly; but in view of the fact that they finally branch upwardly, in the sense that they reach a point above that at which they leave the heater pipe, this does not seem to me a sufficient reason. Further objections to the above view are below considered.

The defendant says that communication of heat by circulation in its offsets is cut off, not by any "heat-insulating effect of trapped gases in the offsets, rendered effective to maintain the temperature of the sprinkler head at a safe point" (see Hammond's statement, above

quoted, of what he has discovered), but by noncirculating water trapped in the loop depression formed in each offset between its junction with the heater pipe and its dead end on which the sprinkler head is carried. The defendant's offsets, therefore, operate, according to its contention, to keep the sprinkler heads from being heated to the temperature of the circulating water, upon a principle essentially different from that employed by Hammond for the same purpose. The plaintiff denies that there is any such difference in operation between the two forms of offset, and upon the questions thus raised the evidence is conflicting.

That air is "trapped" in the dead ends of the defendant's offsets, between the incoming water and the sprinkler head when the system is first filled, cannot be and is not denied. The air so trapped will occupy in the offset pipe below the sprinkler head a space varying in length according to the water pressure, and the amount of such pressure will depend, among other things, upon the vertical difference in level between the sprinkler head and the junction of its offset pipe with the heater pipe.

The defendant says that this air-filled space "doubtless soon is lost and the offset becomes filled with water up to the sprinkler head," and that, as a means of insulation, it neither is nor can be relied on, "for in practice it soon becomes nonexistent." But this does not seem to me sufficiently proved. An air-tight joint between the dead end and the sprinkler head would prevent any disappearance. If no such joint can be made absolutely air-tight, the rate of disappearance must, in any event, depend upon the tightness of the joint, the amount of air trapped, and the pressure maintained upon it. And this must be true, even upon the assumption that, as the defendant insists, no replenishment of the amount of air originally caught as above is possible in the offsets, because there can be no circulation in the water they hold in their loop depressions.

Opinion evidence only is relied on, from witnesses testifying for the defendant, to show that there is no such circulation. But this was to the effect, at most, that there would be no appreciable, or no material circulation, and therefore practically no replenishment of air. Since both forms of offset terminate in dead ends, it seems obvious that in neither can there be as much circulation of the water as in the heater pipes. Because of the fact that water passing into the defendant's offsets from the heater pipe, and losing therein some of its heat, cannot so readily return into the heater pipe as it can from the plaintiff's offsets, it seems very probable that water circulation in the defendant's offsets is less than in the plaintiff's. But I do not think the conclusion required or established by the evidence that circulation is necessarily nonexistent, or never appreciable in amount, in the water contained in the defendant's offsets; it being always part of the body of circulating water in the heater pipe, though held for the time being in a dead end and at a lower level. Unless circulation is completely stopped, it can hardly be said that replenishment of air trapped above the heater pipe level in the dead end has been wholly cut off.

Although, in a paragraph of his specification, subsequent to what has been above quoted from it, Hammond has described the manner in which his sprinkler head offsets were expected to work in operation, and in the description there given has expressly relied upon fresh supplies of water introduced from time to time into the circulating system, and intercepted at the dead ends of his offsets by his arrangement of the offset pipes, permitting them to drain completely into the heater pipe, for the purpose of replenishing the air trapped in their dead ends and thus preventing the water from filling them completely, the same description also makes it clear that air trapped at the dead ends is not his sole reliance for keeping the water temperature there below that in the heater pipe. He says:

"Moreover, the lateral disposition of the offsets with respect to the [heater pipes] presents an effective area of conductive metal in the offsets to the rising current of air coming from all portions of the apartment, so that, even if by temporary accidental exhaustion of the occluded gases these offsets were to be filled with water, the sprinkler head * * * will remain at a temperature safely below that at which sprinkler heads are usually set to release, for a time sufficient to allow restoration of trapped gas."

And as air trapped at the dead ends of the offsets is not the sole means used by Hammond to keep down the temperature of his sprinkler heads, but also water, whether completely or only in part filling the offset pipes, so in the defendant's offsets it is not water alone which protects the sprinkler heads. Air trapped beneath them is also used to obtain the same result. If it is true that more use is made of water than of trapped air in the defendant's offsets than in those of Hammond, or that the defendant's offsets can be relied on for that reason to protect the sprinkler heads for a longer time, I am still unable to accept the conclusion that their mode of operation differs in kind. The most that can be said is that the defendant so uses the same mode of operation as to secure a better result.

The defendant says that if its sprinkler heads were dropped to or below the level of the heater pipe they would not be "upwardly branching," and this may be conceded, if the meaning above given that term is the right one. The term would be certainly inapplicable to offsets having in them no upward curve whatever. Such changes in its offset pipes would result, according to the defendant, in their trapping less air, or none at all, but would neither change their mode of operation nor make them less efficient for their intended purpose. That their mode of operation had been substantially changed could not, in my opinion, be said, so long as trapped air continued to form any part of the insulating means relied on; but such offsets, so using trapped air, would escape the claims in suit only because the claims are limited to upwardly branching offsets. If, as I hold, the offsets before the court in this case are of that kind, they are within the claims, whatever might be said regarding them if differently arranged.

The defendant says that the offsets of the patent require a horizontally disposed section of pipe, which its offsets obviously have not; and this assertion makes it necessary for the defendant to say further that the modified or alternative form of offset shown in Figs. 3 and 4

of the patent, whose straight dead end section, offset from the side of the horizontal pipe, instead of its top, is canted upwardly to bring its dead end above the level of the heater pipe and has no horizontally disposed section whatever, cannot be regarded as covered by the patent or within the claims thereof.

I find nothing in the specification of the patent or the language of its claims which seems to me sufficient to support this contention. What the defendant principally relies on to support it is found in the Patent Office proceedings upon Hammond's application. The office having taken the position that in view of certain forms of offset found in the prior art, it could not regard Hammond's forms as more than mechanical changes not involving invention, this objection was overcome by arguments and affidavits submitted on Hammond's behalf in which it was pointed out that in none of the earlier patents cited was the water, by whose escape through the sprinkler heads fire was to be extinguished, to be heated water, circulating constantly through the pipes, and, except when permitted to escape through the sprinkler heads, availed of only for heating purposes, so that none of them had required offsets contrived for the purpose of protecting sprinkler heads at their ends against the heat of the circulating water.

Hammond appears to have succeeded in satisfying the examiners that his method of arranging the offsets with reference to the heater pipes overcame difficulties with which the earlier patentees referred to had been in no way concerned, with which there had been no attempt at all to deal, except by Nutter and Chatman in their then pending application, and which they had not succeeded in overcoming. In a communication submitted by him under date of February 3, 1913, he dwelt at considerable length upon the amount of air trapped in the horizontally disposed member of offsets such as shown in his Figs. 1 and 2, claiming, among other things, that, whatever the water pressure, this member would always contain a horizontal air column, whose presence would prevent circulation in the water also contained therein.

The defendant says that this amounted to the adoption by Hammond of a theory of operation depending altogether upon the presence of a horizontally disposed section of pipe in the offset; that it necessarily implied the abandonment by him of all forms containing no horizontally disposed member, like those shown in his Figs. 3 and 4, and therefore that "horizontal component of offset" in his claims cannot be taken in the "geometrical" sense above given it, but must be regarded as meaning only the horizontally disposed member of Figs. 1 and 2. If this is the proper construction, the defendant's further contention may well prevail that "upwardly branching" in the claims must be taken as applicable only to offsets which branch from the top of the heater pipe and thus permit drainage from them into it.

But consideration of the whole record upon Hammond's application leaves me unable to believe that his insistence upon the importance of the horizontal air column in what he thought the best embodiment of his invention can fairly be taken as an acceptance on his part of the above limitations. To urge upon the examiners' attention the ef-

fectiveness of horizontally trapped air for the purpose of obtaining his declared object was not necessarily to admit either that the air so trapped, or air in whatever form trapped, was the sole means relied on for that purpose. Hammond seems to me to have dwelt upon the horizontal air column as affording him the illustration best adapted to show the examiners that he had done more than put old forms of offsets supporting sprinkler heads to a new use without any change in function or mode of operation. This he might well do without disclaiming that reliance upon air trapped in other forms of offset, and also upon the water contained in all forms, which, as it seems to me, was sufficiently indicated from the first in his application and is indicated in his patent as issued.

It is said that the sprinkler head would be as well or better protected by making the vertical component of offset equal to or greater than the horizontal component, and that the respective proportions of the two which the patent requires are therefore without functional significance; but this objection I consider sufficiently met by the fact that both in the Nutter and Chatman patent and in Hammond's it is assumed that the heater pipes will be "near the ceiling," and thus render any but a short vertical component unavailable in systems of the kind which both patents contemplate. Whether or not the language about "components of offset" is best adapted to indicate the mode of operation, it seems to me sufficient to enable persons skilled in the art to embody Hammond's idea, and thus secure in his way the advantage he claims to have secured.

Hammond's claim to have solved a problem unsolved by Nutter and Chatman, or by any one before him, seems to me sustained by the evidence, and I am therefore unable to regard the construction of his claims above adopted as making them invalid in view of the prior art. They are therefore held valid, and infringed by the defendant's apparatus, and there may be a decree accordingly.